## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CERTAIN UNDERWRITERS AT
LLOYDS, LONDON,

      Plaintiff,

vs.                                                                          CASE NO:

ANCHOR INSURANCE HOLDINGS, INC.,
NICK W. GRIFFIN, DANIEL S. BOWMAN,
ANCHOR PROPERTY & CASUALTY
INSURANCE COMPANY,
LOZANO INSURANCE ADJUSTERS, INC.,
FRANK LOZANO, LISETTE LOZANO,
and KEVIN PAWLOWSKI,

      Defendants.

_____/

## COMPLAINT FOR RESCISSION, DECLARATORY RELIEF, AND DAMAGES

      CERTAIN UNDERWRITERS AT LLOYDS, LONDON ("Underwriters")

file suit against ANCHOR INSURANCE HOLDINGS, INC. ("Anchor"), NICK

W. GRIFFIN ("Griffin"), DANIEL S. BOWMAN ("Bowman"), ANCHOR

PROPERTY & CASUALTY INSURANCE COMPANY ("Anchor P&C"),

LOZANO INSURANCE ADJUSTERS, INC. ("Lozano Insurance"), FRANK

LOZANO ("Frank"), LISETTE LOZANO ("Lissette"), and KEVIN PAWLOWSKI ("Pawlowski"), and allege:

## NATURE OF ACTION

1.     This is an action for rescission of an insurance policy or, alternatively, for declaratory relief under 28 U.S.C. § 2201 over insurance coverage for disgorgement claims by investors that were not disclosed in the insurance application, among other reasons.

## JURISDICTION AND VENUE

2.     Jurisdiction exists under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the plaintiff and the defendants, and the amount in controversy exceeds $75,000, exclusive of attorney's fees, interests, and costs.

3.     Venue is proper because Underwriters issued and delivered the insurance policy in this district, Anchor Insurance Holdings, Inc., has its principal place of business in this district, the insurance application was completed in this district, and one of the underlying actions is in this district. 28 U.S.C. § 1391(b) (1) and (2).

4.     All conditions precedent to filing suit have been satisfied.

## <u>THE PARTIES</u>

5.      There is complete diversity of citizenship between the parties.

6.      Underwriters are an unincorporated association comprised of these syndicates:

   a.   Syndicate 4020, which is managed by Ark Syndicate
        Management Ltd. ("Ark"). Ark has two subscribing members:
        Ark Corporate Member Limited and SCOR Underwriting
        Limited. Both members are citizens of the United Kingdom.

   b.   Syndicate 1458, which is managed by RenaissanceRe
        Syndicate Management Ltd. ("RenRe"). RenRe has one
        subscribing member: RenaissanceRe Corporate Capital (UK)
        ("RenRe Capital"). RenRe Capital is incorporated in the
        United Kingdom with its principal place of business in
        London, England.

   c.   Syndicate 2001, which is managed by MS Amlin Underwriting
        Limited ("Amlin"). Amlin does not have any subscribing
        members. Amlin has one sole capital provider: MS Amlin
        Corporate Member Limited ("Amlin Corporate"). Amlin
        Corporate is incorporated in the United Kingdom with its
        principal place of business in London, England.

Underwriters are accordingly citizens of the United Kingdom.

7.      Anchor is a Florida Corporation with its principal place of business in
St. Petersburg, Florida. Anchor is accordingly a citizen of Florida.

8.     Anchor P&C is a Florida Corporation with its principal place of business in St. Petersburg, Florida. Anchor P&C is accordingly a citizen of Florida.

9.     Lozano Insurance is a Florida Corporation with its principal place of business in St. Petersburg, Florida. Lozano Insurance is accordingly a citizen of Florida.

10.    Bowman is domiciled in Florida. Bowman is accordingly a citizen of Florida.

11.    Griffin is domiciled in Florida. Griffin is accordingly a citizen of Florida.

12.    Frank Lozano is domiciled in Florida. He is accordingly a citizen of Florida.

13.    Lissette Lozano is domiciled in Florida. She is accordingly a citizen of Florida.

14.    Pawlowski is domiciled in Florida. Pawlowski is accordingly a citizen of Florida.

## UNDERLYING LAWSUIT #1: SME CHILDREN'S COMPLAINT FOR FRAUDULENT MISREPRESENTATION AGAINST ANCHOR

15.     On June 14, 2018, SME Children and a series of investors (the "Investors") filed suit against THD and THD II in the circuit court of Hillsborough County, Florida.

16.     On February 13, 2019, the Investors filed an amended complaint and sued Anchor, Moench, Griffin, and Bowman.

17.     On April 11, 2019, the case was transferred to the circuit court of Pinellas County, Florida, bearing Case No: 19-002760-CI.

18.     On 11/19/2020, the Investors filed a fourth amended complaint.

19.     The Investors' fourth amended complaint is the operative complaint. (*See* Fourth Amended Complaint, copy attached as Exhibit "A.")

20.     The Investors allege Bowman became chairman of Anchor's board in 2016 while simultaneously acting as manager of THD and THD II. (¶¶22, 30.)

21.     Griffin was a member of Anchor's board while simultaneously acting as managing director of Directed Capital. (¶¶23, 30.)

22.     In 2017, to raise funds for the purchase of Anchor's stock owned by the Zagaris Group, Bowman, Griffin, and Moench allegedly solicited the Investors.

But unbeknownst to the Investors, Griffin had been convicted of extortion and was prohibited from engaging in the business of insurance in Florida (¶¶40-6.)

23.     Bowman and Moench allegedly knew of Griffin's felony conviction but chose not to disclose it to the Investors. The Investors allege Bowman and Moench were legally required to disclose Griffin's conviction. (¶¶47-49.)

24.     The Investors allege Anchor, Bowman, and Griffin failed to disclose the conditions of Anchor's financials and its pursuit of a debt raise when they were soliciting their investment. (¶¶49-65.)

25.     On October 5, 2017, the Investors, allegedly relying on misrepresentations, invested approximately $7.45 million in Anchor, through THD. In connection with their investment, the Investors executed subscription agreements. (¶65.)

26.     Between November 7 and November 10 of 2017, the Investors invested $3.9 million more in Anchor. This time through THD II—which was formed on November 2, 2017. (¶66.)

27.     Count I of the Investors' complaint is for violation of Florida's Securities and Investors Protection Act and is directed against THD, THD II, Anchor, Moench, Bowman, and Griffin. The Investors allege Bowman on behalf

of Anchor, THD, THD II, Griffin on behalf of Anchor and Directed Capital, and Moench on behalf of THD, THD II, and Directed Capital, solicited the investment from them, and in doing so, they made material misrepresentations and omissions regarding the debt raise and Anchor's financial situation." (¶¶82-84.)

28.     In Counts VI and VIII, the Investors allege negligent misrepresentation against Anchor, Directed Capital, Moench, Bowman, and Griffin. They allege Moench, Bowman, and Griffin, individually and on behalf of Anchor and Directed Capital, solicited investments and made material misrepresentations about the debt. (¶¶108-113, 119-124.)

29.     In Counts VII and IX, the Investors allege fraudulent inducement against Anchor, Directed Capital, Moench, Bowman, and Griffin and allege Moench, Bowman, and Griffin, individually and on behalf of Anchor and Directed Capital, solicited investments through material misrepresentations about the debt. (¶¶108-113, 119-124.)

30.     As damages, the Investors seek rescission, including the return of their investment funds, interests, costs, and attorney's fees pursuant to Fla. Stat. § 517.211(6).

## UNDERLYING LAWSUIT #2: EDUARDO TESINI'S COMPLAINT AGAINST ANCHOR P&C

31.     On November 29, 2018, Eduardo Tesini ("Tesini") filed a one-count complaint against Anchor P&C in the circuit court of Miami-Dade County, Florida, bearing case No: 2018-039891-CA-01. (*See* Complaint, copy attached as Exhibit "B.")

32.     The complaint was then served on Florida's Chief Financial Officer on December 5, 2018, and a copy was forwarded to Anchor P&C on December 10, 2018. (*See* Notice of Service of Process, copy attached as Exhibit "C.")

33.     The complaint alleges a bad faith count against Anchor P&C "for damages arising out of [it's] failure to settle a claim made by Maria Benitez, as personal representative of the Estate of Jose Gonzalez against Ekkeko Holdings, LLC and Eduardo Tesini." (¶1.)

## UNDERLYING LAWSUIT #3: MOSLEY'S CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FAIR LABOR STANDARDS ACT

34.     On April 3, 2019, Sheri Mosley, individually and on behalf of others similarly situated, filed suit against Lozano Insurance, Anchor, Frank Lozano, and Lissette Lozano (jointly, the "Employers"). Her complaint was filed in the

United States District Court, Middle District of Florida, bearing Case No: 19-cv-00379.

35.     On February 5, 2020, Mosley amended her complaint and named Kevin Pawlowski as a defendant. (*See* Complaint, copy attached as Exhibit "D.")

36.     Mosley alleged that she and 60 other claims handlers worked far in excess of 40 hours per week, including working 12 hours per day, seven days per week, from September to November 2017. But despite the long hours, they were not paid overtime wages. Instead, they were told they were independent contractors. And based on this misrepresentation, they were required to shoulder the Employers' business expenses, including tax responsibilities. (¶1.)

37.     Mosley also alleged the Employers unjustly enriched themselves "by misrepresenting the class members' employment status and requiring them to pay the [Employers'] business costs." (¶3.)

38.     According to her, the Employers' refusal to pay an overtime premium for work that exceeded 40 hours in a week was a "willful policy and pattern or practice." (¶58.)

39.     In Count I, for violations of the Fair Labor Standards Act ("FLSA"), she alleged the Employers "engaged in a widespread pattern, policy, and practice of

violating the FLSA." She also alleged the "[Employers'] violations of the FLSA…[were] willful and intentional." (¶¶68, 75.)

40.     In Count II, for negligent misrepresentation, Mosley alleged the Employers engaged in a widespread pattern, policy, and practice of misrepresenting the claims handlers' employment status as independent contractors rather than employees. Accordingly, for months, the claims handlers worked without overtime wages and to pay their business expenses. (¶¶ 80-83.)

## UNDERLYING LAWSUIT #4: ALFONSO'S BREACH OF INSURANCE CONTRACT COMPLAINT AGAINST ANCHOR P&C

41.     On August 22, 2019, Lukas Alfonso filed a two-count complaint against Anchor P&C in the circuit court of Broward County, Florida, bearing Case No: CACE19017587. This complaint remains the operative complaint. (*See* Complaint, copy attached as Exhibit "E.")

42.     In his complaint, Alfonso alleges that on March 4, 2016, he was injured by an insured of Anchor P&C. But, Anchor P&C wrongfully refused to defend and indemnify its insured against his claims. (¶¶ 5-17.)

43.     Accordingly, he and the insured negotiated a $1,500,000 consent judgment. The parties also agreed that Alfonso would not execute the judgment

against the insured. Instead, he would pursue a claim against Anchor P&C. (¶¶21-4.)

44.     In Count I of his complaint, for breach of contract, Alfonso alleges Anchor P&C breached the terms of the policy by "failing to provide them with coverage and a defense." (¶28.)

45.     As damages, Alfonso seeks payment of the $1,500,000 consent judgment. (¶36.)

## ANCHOR MISREPRESENTED MATERIAL FACTS IN ITS APPLICATION FOR INSURANCE TO UNDERWRITERS

46.     On **October 16, 2018**, Anchor's Chief Financial Officer signed a Cove Program Insurance Company Management Professional Liability Insurance Application ("Application") on behalf of Anchor, the applicant. (*See* Application, copy attached as Exhibit "F.")

47.     Page 2, Questions 9 and 10 of the Application provide in pertinent:

**SECTION C – CLAIMS INFORMATION**

9.    Has there been, or is there now pending any claim(s), suit(s), investigation(s) or action(s) against the Applicant, its subsidiaries, or any other director, officer or employee of any Applicant arising out of: (i) any director, officer, employee or entity liability matter; or (ii) any matter claimed against any person proposed for insurance in his or her capacity as a director, officer, plan fiduciary or employee?

Please answer with regard to:

| | | |
|---|---|---|
| Private Company Directors and Officers Liability | Yes ☐ No ☒ | N/A ☐ |
| Insurance Company Professional Liability | Yes ☐ No ☒ | N/A ☐ |
| Employment Practices Liability | Yes ☐ No ☒ | N/A ☐ |
| Network Security and Privacy Liability | Yes ☐ No ☐ | N/A ☐ |
| Fiduciary Liability | Yes ☐ No ☒ | N/A ☐ |

If "Yes", please attach full 5 year currently valued loss runs and attach claims supplement for each claim.

10.   Does the Applicant, its subsidiaries, or any director, officer or employee of the Applicant know of any act, error or omission, which could give rise to a claim(s), suit(s) or action(s) under the proposed policy with regard to?

| | | |
|---|---|---|
| Private Company Directors and Officers Liability | Yes ☐ No ☒ | N/A ☐ |
| Insurance Company Professional Liability | Yes ☐ No ☒ | N/A ☐ |
| Employment Practices Liability | Yes ☐ No ☒ | N/A ☐ |
| Network Security & Privacy Liability | Yes ☐ No ☐ | N/A ☐ |
| Fiduciary Liability | Yes ☐ No ☒ | N/A ☐ |

48.    Pages 19-20 of the Application contain the following language immediately above the applicant's signature:

THE UNDERSIGNED AUTHORIZED OFFICER OF THE APPLICANT DECLARES THAT THE STATEMENTS SET FORTH HEREIN ARE TRUE. THE UNDERSIGNED AUTHORIZED OFFICER AGREES THAT IF THE INFORMATION SUPPLIED ON THIS APPLICATION CHANGES BETWEEN THE DATE OF THIS APPLICATION AND THE EFFECTIVE DATE OF THE INSURANCE, HE/SHE (UNDERSIGNED) WILL, IN ORDER FOR THE INFORMATION TO BE ACCURATE ON THE EFFECTIVE DATE OF THE INSURANCE, IMMEDIATELY NOTIFY THE INSURER OF SUCH CHANGES, AND THE INSURER MAY WITHDRAW OR MODIFY ANY OUTSTANDING QUOTATIONS AND/OR AUTHORIZATIONS OR AGREEMENTS TO BIND THE INSURANCE.

SIGNING OF THIS APPLICATION DOES NOT BIND THE APPLICANT OR THE INSURER TO COMPLETE THE INSURANCE, BUT IT IS AGREED THAT THIS APPLICATION SHALL BE THE BASIS OF THE CONTRACT SHOULD A POLICY BE ISSUED, AND IT WILL BE ATTACHED TO AND BECOME PART OF THE POLICY.

ALL WRITTEN STATEMENTS AND MATERIALS FURNISHED TO THE COMPANY TO WHICH THIS APPLICATION IS SUBMITTED IN CONJUNCTION WITH THIS APPLICATION ARE HEREBY INCORPORATED BY REFERENCE INTO THIS APPLICATION AND MADE A PART HEREOF.

THE INSURED REPRESENTS THAT THE INFORMATION FURNISHED IN THIS APPLICATION IS COMPLETE, TRUE AND CORRECT. ANY MISREPRESENTATION, OMISSION, CONCEALMENT OR INCORRECT STATEMENT OF A MATERIAL FACT, IN THIS APPLICATION OR OTHERWISE, SHALL BE GROUNDS FOR THE RESCISSION OF ANY BOND OR POLICY ISSUED.

49.     Anchor marked the "No" box with an "X" in its answer to Questions 9 and 10 of the Application.

50.     These answers are false and are material.

51.     On **December 16, 2016**, Tesini's counsel warned Anchor P&C that he would be filing the underlying bad faith action against it. The email provides in pertinent:

> I am shocked that even with your disclosures of duplicitous representations of your client, the insurance company, and nothing more than their bad faith settlement of a claim which you and they knew would leave their insured exposed to exactly this type of action (filed by the same attorney you negotiated with) you, nevertheless are apparently unwilling to defend your Release in any way….

> "No claim had been asserted at the time against the property management company…

> Although I am no expert on the field…the words "bad faith" and "malpractice" have never rang more true to me. (*See* Email, copy attached as Exhibit "G.")

52.     At the time, Anchor P&C had settled the wrongful death claim by the estate of Jose Gonzalez against Tesini. But it failed to obtain a release of the claims against Ekkeko Holdings ("Ekkeko"), which had an indemnification agreement in its favor with Tesini and was threatening to file a third-party complaint against Tesini. Anchor P&C's refusal to obtain a release of the claims

against Ekkeko resulted in a third-party complaint against Tesini and the subsequent underlying bad faith action.

53.     In **January 2018**, when it became apparent that the Investors were unhappy with their investment, Steven Esrick ("Esrick"), an investor, sent Moench an email which provides in pertinent:

> If you read below even after talking to Scott and Mark, like Kerry, they are wanting out. (See Email, copy attached as Exhibit "H.")

54.     On **March 13, 2018**, Esrick sent Moench another email, which provides:

> I really think rescission is the best. We can work out the details. The Tibbets family can come up with the money, personal guarantee on with collateral, etc. You and I can work it out. (See Email, copy attached as Exhibit "I.")

55.     On **March 22, 2018**, Esrick sent an email to Neil Savage of Directed Capital. Esrick's email reads in part:

> We have been asking for rescission (returning our stock) since December when [Bowman] finally let me know that he was raising money (debt) simultaneously to raising money from us. Total misrepresentation. (See Email, copy attached as Exhibit "J.")

56.     On **April 6, 2018**, the Investors, through counsel, sent a letter to Anchor's board demanding rescission of their investment. Specifically, the Investors' letter reads in pertinent:

The Investors, based on both written and oral statements made to them, invested approximately $11.7 million in THD and THD II, and in turn, these funds were invested in Anchor Insurance…

The investors would not have invested if these material facts had been disclosed.

Accordingly, on behalf of the Investors and consistent with Florida Statute 517.211, please consider this letter a demand for rescission of the investment(s) in question. In connection with the rescission, the Investors hereby tender their securities. (See Letter, copy attached as Exhibit "K.")

57.     On **May 8, 2018**, the Investors sent a subsequent letter which reads:

While we appreciate you outlining the events in your letter, nothing in your chronology changes our analysis. Nonetheless, we agree that a pre-suit informal meeting with our clients is worthwhile. We will let you know what dates we are available. If you would otherwise like to discuss this further, feel free to give me a call. (See Letter, copy attached as Exhibit "L.")

58.     On **May 15, 2018**, the Investors, through counsel, sent another letter

which provides:

Please keep in mind this is not a situation wherein our clients waited to gauge investment performance before demanding rescission. Your clients will agree that immediately after Mr. Esrick received the agenda for the December Board meeting, he contacted your clients' representatives. We are confident your clients don't believe that Mr. Esrick was putting on an act by fabricating the fact the debt raise and the CEA engagement weren't disclosed.

> We too, hope an amicable resolution can be reached and look
> forward to hearing from you. (See Letter, copy attached as
> Exhibit "M.")

59.     On **May 31, 2019**, Esrick resigned from Anchor's board and sent the rest

of the board members a letter that provides:

> This letter will constitute my official resignation from the
> Board of Directors of Anchor Insurance effective immediately.
> Please confirm that you will take the proper steps to have me
> removed regarding any state and regulatory requirements as
> well as letting the other Board Members know that I am no
> longer on the board. (See Letter, copy attached as Exhibit
> "N.")

## THE UNDERWRITERS POLICY

60.     Based on the representations in the application, Underwriters issued a

claims made and reported surplus lines Insurance Company Modular Policy to

"Anchor Insurance Holdings, Inc." as the Named Entity, bearing Policy Number

B0621PANCH001718, and effective from November 30, 2018 to November 30,

2019. (*See* Policy, copy attached as Exhibit "O.")

61.     The policy provides in pertinent:

**Financial Institutions Risk Protector**
**General Terms and Conditions**

1.   **TERMS AND CONDITIONS**

These General Terms and Conditions shall be applicable to all **Coverage Sections,** unless otherwise explicitly stated to the contrary in either these General Terms and Conditions or the relevant **Coverage Section.** The terms and conditions set forth in each **Coverage Section** shall only apply to that particular **Coverage Section** and shall in no way be construed to apply to any other **Coverage Section** of this policy.

2.   **DEFINITIONS...**

**(e)**   **"Company"** means (i) the **Named Entity,** (ii) any **Subsidiary** thereof, and, (iii) in the event a bankruptcy proceeding shall be instituted by or against the foregoing entities, the resulting debtor-in-possession (or equivalent status outside the United States), if any...

**(x)**   **"Loss"** means **Loss,** as that term is defined within each **Coverage Section**...

**(bb)**   **"Outside Entity"** means any: (1) not-for-profit organization; or (2) other entity listed as an "Outside Entity" in an endorsement attached to this policy.

**(cc)**   **"Outside Entity Executive"** means any: (1) **Director(s)** or **Officer(s)** of the **Company** who is or was acting at the specific written request or direction of the **Company** as a Director(s) or Officer(s) of an **Outside Entity**; or (2) any other person listed as an **Outside Entity Executive** in an endorsement attached to this policy.

(mm) **"Wrongful Act"** means a **Wrongful Act,** as that term is defined within each C**overage Section.**

4.    **EXCLUSIONS**

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured:**

(a)    Arising out of, based upon or attributable to the gaining of any profit or advantage to which any final adjudication establishes the **Insured(s)** were not legally entitled…

(f)    for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act)…provided, however, that with respect to the EPL **Coverage Section** only, this exclusion shall not apply to a **Claim** for **Retaliation**…

(g)    alleging, arising out of, based upon, or attributable to, directly or indirectly, the refusal, failure or inability of any **Insured(s)** to pay wages or overtime pay for services rendered (hereinafter, **"Earned Wages")** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported employee(s), including but not limited to (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages,** or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported employee(s) was improperly classified or mislabeled as "exempt;" or

(h)    alleging, arising out of, based upon or attributable to, directly or indirectly, any obligation pursuant to any

workers' compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar benefits; provided, however, this exclusion shall not apply:

(1) with respect to the EPL **Coverage Section** only, to a **Claim** for **Retaliation;** and

(2) to the extent coverage is afforded pursuant to the FLI **Coverage Section** only...

\*\*\*

**Financial Institutions Risk Protector
DIRECTORS, OFFICERS AND PRIVATE
FINANCIAL INSTITUTION LIABILITY
("D&O COVERAGE SECTION")**

**2.   DEFINITIONS**

(b)   **"Individual lnsured(s):** means any:

(1)   **Director(s) or Officer(s)** of the **Company;**

(2)   **Employee(s)** of the **Company;** and

(3)   **Outside Entity Executive(s).**

(c)   **"lnsured(s)"** mean:

(1)   any **Individual Insured;** and

(2)   the **Company.**

(d)   **"Loss"** means damages, judgments (including pre-judgment and post-judgment interest on that part of any judgment paid under this **Coverage Section)**, settlements and **Defense Costs;** however, **Loss** (other than **Defense Costs)** shall not include: … and (4) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed. …

3.   **EXCLUSIONS**

In addition to the exclusions set forth in Clause 4 of the General Terms and Conditions, the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured:**

(a)   arising out of, based upon or attributable to the committing of any deliberate criminal, fraudulent or dishonest act or any willful violation of any statute, rule or law by the **Insured,** if any final adjudication establishes that such deliberate criminal, fraudulent, dishonest act or willful violation of any statute, rule or law was committed…

(e)   alleging, arising out of, based upon or attributable to, directly or indirectly, any actual or alleged act or omission of an **Individual Insured** serving in his or her capacity as a **Director or Officer** or **Employee** of any entity that is not the **Company** or an **Outside Entity,** or by reason of his or her status as a **Director or Officer** or **Employee** of such other entity…

(h)   with respect to Coverage B(i) only:

(2)   alleging, arising out of, based upon or attributable to, directly or indirectly, any actual or alleged contractual liability of any **Insured**

under any contract or agreement (either oral or written)…

6.      **REPRESENTATIONS AND SEVERABILITY**

In granting coverage under this **Coverage Section**, it is agreed that the **Insurer** has relied upon the statements, warranties, and representations contained in the application for this policy (including materials submitted thereto and, if this is a renewal application, all such previous policy applications for which this policy is a renewal) as being accurate and complete. All such statements, warranties and representations are the basis for this **Coverage Section** and are to be considered as incorporated into this **Coverage Section**.

The **Insureds** agree that in the event that such statements, warranties and representations are not accurate and complete and materially affect either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy, then this **Coverage Section** shall be void *ab initio* solely with respect to any of the following **Insureds**…

(a)     a **Company**, under Clause 1. Insuring Agreement, COVERAGE B(ii), to the extent it indemnifies any **Individual Insured** referenced in (a) above; and

(b)     a **Company**, under Clause 1. Insuring Agreement, COVERAGE B(i), if any past or present chief executive officer, chief financial officer or general counsel (or any equivalent position) of the **Company** knew as of the inception date of the **Policy Period**, the facts that were not accurately and completely disclosed in the application;

whether or not such **Individual Insured** knew that such facts were not accurately and completely disclosed in the application.

*****

## EMPLOYMENT PRACTICES LIABILITY
## COVERAGE SECTION
## ("EPL COVERAGE SECTION")

**2.      DEFINITIONS…**

(e)      **"Individual Insured(s)"** means any **Director or Officer, Outside Entity Executive** or **Employee** of the **Company.**

(f)      **"Insured(s)"** means:

(1)      any **Individual Insured;** and

(2)      the **Company.**

(g)      **"Loss"** means damages (including front pay and back pay), judgments (including pre-judgment and post-judgment interest on that part of any judgment paid under this **Coverage Section),** settlements, **Defense Costs** and **Employment Crisis Management Loss;** however, **Loss** (other than **Defense Costs)** shall not include: (1) civil or criminal fines or penalties; (2) taxes; (3) any amount for which the **Insureds** are not financially liable or which are without legal recourse to the **Insureds;** (4) employment-related benefits, stock options, perquisites, deferred compensation or any other type of compensation other than salary, wages or bonus compensation; (5) any liability or costs incurred by any **Insured** to modify any building or property in order to make said building or property more accessible or accommodating to any disabled person; or any liability or costs incurred in connection with any educational, sensitivity or other

corporate program, policy or seminar relating to a **Claim** alleging discrimination or other **Wrongful Act;** or (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

Notwithstanding the foregoing paragraph, **"Loss"** shall specifically include (subject to this policy's other terms, conditions and limitations, including but not limited to Exclusion (a) of this **Coverage Section** and Exclusion (a) of the General Terms and Conditions) punitive, exemplary and multiple damages Enforceability of this paragraph shall be governed by such applicable law that most favors coverage for such penalties and punitive, exemplary and multiple damages. For purposes of such coverage, "applicable law" includes, but is not limited to the following jurisdictions. (a) where the **Wrongful Act** actually or allegedly took place; (b) where the damages are awarded; (c) where the **Named Entity** resides, is incorporated or has its principal place of business; and (d) where the **Insurer** is incorporated or has its principal place of business…

3.   **EXCLUSIONS**

In addition to the exclusions set forth in Clause 4 of the General Terms and Conditions, the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured:**

(a)   arising out of, based upon or attributable to the committing of any deliberate criminal, fraudulent or dishonest act or any willful violation of any statute, rule or law, if any judgment, final adjudication or any alternative dispute resolution proceeding adverse to the

**Insured(s)** establishes that such deliberate criminal, fraudulent, dishonest act or willful violation of any statute, rule or law occurred;

\*\*\*

**Financial Institutions Risk Protector**
**INSURANCE COMPANY LIABILITY**
**("ICL COVERAGE SECTION")**

2.    **DEFINITIONS...**

(d)    **"Loss"** means damages, judgments (including pre-judgment and post-judgment interest on that part of any judgment paid under this **Coverage Section),** settlements and any **Defense Costs;** provided, however, that **Loss** (other than **Defense Costs)** shall not include: (1) civil fines or penalties; (2)taxes; (3) punitive or exemplary damages; (4) the multiplied portion of multiplied damages; (5) any liability or cost incurred by any **Insured** in complying with any judgment, award or settlement for non-monetary relief; (6) any amounts for which the **Insured** is or is alleged to be liable under any insurance or reinsurance policy, contract, treaty, binder, slip, certificate, cover note, agreement, suretyship, endorsement, endowment or annuity; (7) any amounts for which the **Insured** is entitled to indemnity and/or payment under any other insurance or reinsurance contract; (8) any amount for which an **Insured** is not financially liable or which is without legal recourse to the **Insured**; or (9) matters which may be deemed uninsurable under the law pursuant to which this poicy shall be construed.

Notwithstanding the foregoing paragraph, **Loss** shall specifically include (subject to this policy's other

terms, conditions and limitations, including but not limited to Exclusions (a) and (b) of this **Coverage Section** and Exclusion (a) of the General Terms and Conditions) punitive or exemplary damages and the multiplied portion of multiplied damages. Enforceability of this paragraph shall be governed by such applicable law that most favors coverage for such punitive and exemplary damages. For purposes of such coverage, "applicable law" includes. but is not limited to, the following jurisdictions: (a) where the **Wrongful Act** actually or allegedly took place; (b) where the damages are awarded; (c) where the **Named Entity** resides, is incorporated or has its principal place of business; and (d) where the **insurer** is incorporated or has its principal place of business.

***

## GENERAL TERMS AND CONDITIONS ENDORSEMENT

1.      **DEFINITIONS** (I), (o) and (II) are deleted and replaced by the following:

(I)      **"Director(s) or Officer(s)"** means any:

(1)      past, present and future duly elected or appointed director or officer of a corporation and member of the Board of Managers and member of the management board of a limited liability company (or equivalent positions formed anywhere in the world);

(2)      with respect to operations of the **Company** in a **Foreign Jurisdiction,** such past, present and future persons is duly elected or appointed positions of the **Company** that are equivalent to

an executive position listed in paragraph (1) of this definition; and

(3)    past, present and future in-house general counsel and risk manager (or equivalent position formed anywhere in the world) of the **Named Entity.**

\*\*\*

## NAMED INSURED SCHEDULE

**1.**    **Solely in respect of Directors and Officers Liability**

| Named Insured | Retroactive Date |
|---|---|
| Anchor Insurance Holdings, Inc. Acts | Full Prior |
| Anchor Property and Casualty Insurance Company… | 25th June 2014… |
| Lozano Insurance Adjusters, Inc… 2014… | June 25 |

**2.**    **Solely in respect of Employment Practices Liability**

| Named Insured | Retroactive Date |
|---|---|
| Anchor Insurance Holdings, Inc. Acts | Full Prior |
| Anchor Property and Casualty Insurance Company… | 25th June 2014… |
| Lozano Insurance Adjusters, Inc… 2014… | June 25 |

3.      Solely in respect of Professional Liability (Insurance Company Liability)

| Named Insured | Retroactive Date |
|---|---|
| Anchor Insurance Holdings, Inc. Acts | Full Prior |
| Anchor Property and Casualty Insurance Company… | 25th June 2014… |
| Lozano Insurance Adjusters, Inc… 2014… | June 25 |

## COUNT I – COMMON LAW RESCISSION

62.      Underwriters incorporate paragraphs 1 – 61.

63.      Underwriters issued a claims made and reported surplus lines Insurance Company Modular Policy to "Anchor Insurance Holdings, Inc." as the Named Entity, bearing Policy Number B0621PANCH00171, and effective from November 30, 2018 to November 30, 2019.

64.      To issue the Policy, Underwriters relied on the Application executed by Anchor's CFO on October 16, 2018.

65.      Anchor's responses to Questions 9 and 10 of the Application contained material misrepresentations.

66.    In response to Question 9, which asked if there were any pending "claim(s), investigation(s) or action(s) against the Applicant…," Anchor answered "No." But, that answer was false. At the time the Application was submitted, the Investors had already made a claim for rescission.

67.    In response to Question 10, which asked, "Does the Applicant…know of any act, error, or omission, which could give rise to a claim(s), suit(s) or actions…," Anchor Answered "No." But that answer was false. At the time the Application was submitted, Anchor knew of the potential lawsuits by the Investors and also by Tesini.

68.    The misrepresentations were material because Underwriters would not have issued the policy if they knew the actual answers to Questions 9 and 10 were "Yes."

69.    The misrepresentations were also material because Underwriters would have charged Anchor a higher premium if they knew the actual answers to Questions 9 and 10 were "Yes."

70.    Underwriters rescinded the policy and agree to tender the premium back to Anchor.

71.     There is no adequate remedy at law available to Underwriters for Anchor's material misrepresentations.

72.     Consequently, the Underwriters policy is void *ab initio* because Anchor misrepresented material facts in its application.

## COUNT II – CONTRACTUAL RESCISSION OF
## THE D&O COVERAGE SECTION

73.     Underwriters incorporate paragraphs 1 – 61.

74.     The D&O Coverage Section of the policy provides that Underwriters "relied upon the statements, warranties, and representations contained in the application for this policy…as being accurate and complete." (*See* Policy, Pg. 36.)

75.     The policy also provides that "[t]he Insureds agree that in the event such statements, warranties and representations are not accurate and complete and materially affect either the acceptance of the risk of the hazard assumed by the Insurer under the policy, then this Coverage Section shall be void *ab initio*…" (*See* Policy, Pg. 36.)

76.     On October 16, 2018, Anchor's CFO executed the Application.

77.      Anchor's responses to Questions 9 and 10 of the Application were no accurate; they were material misrepresentations.

78.     In response to Question 9, which asked if there were any pending "claim(s), investigation(s) or action(s) against the Applicant…," Anchor answered "No." But, that answer was false. At the time the Application was submitted, the Investors had already made a claim for rescission.

79.     In response to Question 10, which asked, "Does the Applicant…know of any act, error, or omission, which could give rise to a claim(s), suit(s) or actions…," Anchor Answered "No." But that answer was false. At the time the Application was submitted, Anchor knew of the potential lawsuits by the Investors and also by Tesini.

80.     The misrepresentations were material because Underwriters would not have issued the policy if they knew the actual answers to Questions 9 and 10 were "Yes."

81.     The misrepresentations were also material because Underwriters would have charged a higher premium to Anchor if they knew the actual answers to questions 9 and 10 were "Yes."

82.     Consequently, the D&O Coverage Section of the policy is contractually void *ab initio.*

## COUNT III – NO COVERAGE FOR ANCHOR, BOWMAN, AND GRIFFIN UNDER THE CONTRACTUAL LIABILITY EXCLUSION

83.     Underwriters incorporate paragraphs 1 – 61.

84.     Exclusion 3 H(2) of the D&O Coverage Section bars coverage for claims "alleging, arising out of, based upon or attributable to, directly or indirectly, any actual or alleged contractual liability for any Insured under any contract or agreement (either oral or written). (*See* Policy, Pg. 32.)

85.     In their complaint, the Investors allege that in connection with their investment, they executed subscription agreements that were procured by Anchor, Bowman, and Griffin through material misrepresentations.

86.     Accordingly, there is no coverage for the claims against Anchor, Bowman, and Griffin that arise out of contractual liability, *i.e.*, the subscription agreements.

## COUNT IV – NO COVERAGE FOR ANCHOR, BOWMAN, AND GRIFFIN UNDER THE DISHONEST OR FRAUDULENT ACTS EXCLUSION

87.     Underwriters incorporate paragraphs 1 – 61.

88.     The Dishonest or Fraudulent Acts Exclusion of the D&O Coverage Section bars coverage for any claims "arising out of, based upon or attributable

to the committing of any deliberate criminal, fraudulent, or dishonest act or any willful violation of any statute, rule or law by the Insured, if any final adjudication establishes that such deliberate criminal, fraudulent, dishonest act or willful violation of any statute, rule or law was committed." (*See* Policy, Pg. 31.)

89.     The Investors allege Anchor, Bowman, and Griffin fraudulently made material misrepresentations about Anchor's debt raise and financial status, as well as Griffin's felony conviction. These misrepresentations were allegedly made to induce them to invest in Anchor.

90.     Accordingly, there is no coverage for Anchor, Bowman, or Griffin if a final adjudication establishes they committed deliberate fraudulent or dishonest acts, or violated any statute.

### COUNT V – NO COVERAGE FOR BOWMAN AND GRIFFIN UNDER THE OUTSIDE ENTITY EXCLUSION

91.     Underwriters incorporate paragraphs 1 – 61.

92.     The Outside Entity Exclusion of the D&O Coverage Section bars coverage for claims "alleging, arising out of, based upon or attributable to, directly or indirectly, any actual or alleged act or omission of an Individual Insured serving in his or her capacity as a Director or Officer or Employee of any

entity that is not the Company…or by reason of his or her status as a Director or Officer or Employee of such other entity." (*See* Policy, Pg. 32.)

93.     The Investors allege Bowman, on behalf of THD and THD II, and Griffin, on behalf of Directed Capital, solicited the investment from them. In doing so, they made material misrepresentations and omissions about Anchor's financial situation and debt raise, as well as Griffin's felony conviction.

94.     Accordingly, there is no coverage for Bowman and Griffin under the Outside Entity Exclusion.

### COUNT VI – NO COVERAGE FOR BOWMAN, AND GRIFFIN UNDER THE GAIN OF PROFIT OR ADVANTAGE EXCLUSION

95.     Underwriters incorporate paragraphs 1 – 61.

96.     The Gain of Profit or Advantage Exclusion bars coverage for claims "arising out of, based upon or attributable to the gaining of any profit or advantage to which any final adjudication establishes the Insured(s) were not legally entitled to." (*See* Policy, Pg. 15.)

97.     The Investors allege they were induced to invest in Anchor for the express purpose of assisting Bowman, Griffin, THD, and Directed Capital to gain controlling interest on Anchor's board.

98.     Accordingly, there is no coverage for Bowman and Griffin under the Gain of Profit or Advantage Exclusion if a final adjudication establishes they gained profit they were not entitled to.

### COUNT VII – NO COVERAGE FOR ANCHOR, ANCHOR P&C, LOZANO INSURANCE, FRANK LOZANO, LISSETTE LOZANO, AND KEVIN PAWLOWSKI UNDER THE FAIR LABOR STANDARDS ACT EXCLUSION

99.     Underwriters incorporate paragraphs 1 – 61.

100.   Exclusion (f) of the General Terms and Conditions bars coverage for claims "for violations of any of the responsibilities, obligations or duties imposed by the … Fair Labor Standards Act." (*See* Policy, Pg. 16.)

101.   In her complaint, Mosley alleged the claims handlers worked far in excess of 40 hours per week. Indeed, she alleged the claims handlers worked 12 hours per day, seven days per week, from September to November 2017. But they were not paid overtime wages, in violation of the Fair Labor Standards Act.

102.   Accordingly, there is no coverage for Anchor, Anchor P&C, Lozano Insurance, Frank Lozano, Lissette Lozano, and Kevin Pawlowski under the Fair Labor Standards Act Exclusion.

## COUNT VIII – NO COVERAGE FOR ANCHOR, ANCHOR P&C, LOZANO INSURANCE, FRANK LOZANO, LISSETTE LOZANO, AND KEVIN PAWLOWSKI UNDER THE EMPLOYEE MISLABELING EXCLUSION

103.    Underwriters incorporate paragraphs 1 – 61.

104.    Exclusion (g) of the General Terms and conditions bars coverage for claims "alleging, arising out of, based upon, or attributable to, directly or indirectly, the refusal, failure or inability of any Insured(s) to pay wages or overtime pay for services rendered…or improper payroll deductions  taken by any Insured(s) from any Employee(s)  or purported employee(s), including, but not limited to (i) any unfair business practice claim alleged because  of the failure to pay Earned Wages,  or (ii) any Claim seeking Earned Wages because any Employee(s)  or purported employee(s) was improperly classified or mislabeled as exempt." (*See* Policy, Pg. 17.)

105.    Mosley alleged the claims handlers worked far in excess of 40 hours per week between September and November of 2017.

106.    She also alleged that despite the long hours, they were not paid overtime wages because they were improperly classified as exempt independent contractors.

107.    Accordingly, there is no coverage for Anchor, Anchor P&C, Lozano Insurance, Frank and Lissette Lozano, and Kevin Pawlowski under the Employee Mislabeling Exclusion.

### COUNT IX – NO COVERAGE FOR ANCHOR, ANCHOR P&C, LOZANO INSURANCE, FRANK LOZANO, LISSETTE LOZANO, AND KEVIN PAWLOWSKI UNDER THE EMPLOYEE BENEFITS EXCLUSION

108.    Underwriters incorporate paragraphs 1 – 61.

109.    Exclusion (h) of the General Terms and conditions bars coverage for claims "alleging, arising out of, based upon or attributable to, directly or indirectly, any obligation pursuant to any worker's compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar benefits" (*See* Policy, Pg. 17.)

110.    In her complaint, Mosley alleged she and the other insurance claims handlers were required to shoulder their Employers' business expenses, including tax responsibilities and other employment benefit responsibilities due to their misclassification as independent contractors.

111.    Accordingly, there is no coverage for Anchor, Anchor P&C, Lozano Insurance, Frank and Lissette Lozano, and Kevin Pawlowski under the Employee Benefits Exclusion.

## COUNT X – NO COVERAGE FOR ANCHOR, ANCHOR P&C, LOZANO INSURANCE, FRANK LOZANO, LISSETTE LOZANO, AND KEVIN PAWLOWSKI UNDER THE WILLFUL STATUTORY VIOLATION EXCLUSION

112.   Underwriters incorporate paragraphs 1 – 61.

113.   Exclusion (a) of the EPL Coverage Section bars claims "arising out of, based upon or attributable to the committing of any deliberate criminal, fraudulent or dishonest act or any willful violation of any statute, rule or law, if any judgment, final adjudication or any alternative dispute resolution proceeding adverse to the Insured(s) establishes that such deliberate criminal, fraudulent, dishonest act or willful violation of any statute, rule or law occurred." (*See* Policy, Pg. 41.)

114.   Mosley alleged that her Employers' refusal to pay her and the other claims handlers overtime wages, in violation of the Fair Labor Standards Act, was a willful policy and pattern or practice.

115.   Accordingly, there is no coverage for Anchor, Anchor P&C, Lozano Insurance, Frank Lozano, Lissette Lozano, and Kevin Pawlowski if a final adjudication establishes their violations of the Fair Labor Standards Act was willful.

## COUNT XI – NO COVERAGE FOR ANCHOR, ANCHOR P&C, LOZANO INSURANCE, FRANK LOZANO, LISSETTE LOZANO, AND KEVIN PAWLOWSKI UNDER THE GAIN OF PROFIT OR ADVANTAGE EXCLUSION

116.    Underwriters incorporate paragraphs 1 – 61.

117.    The Gain of Profit or Advantage Exclusion bars coverage for claims "arising out of, based upon or attributable to the gaining of any profit or advantage to which any final adjudication establishes the Insured(s) were not legally entitled to." (*See* Policy, Pg. 15.)

118.    Mosley alleged the Employers shifted their business expenses onto the claims handlers by misclassifying them as exempt independent contractors.

119.    She also alleged the Employers have unjustly enriched themselves at the expense of the claim handlers by misrepresenting the claims handlers' employment status and requiring them to pay their business costs.

120.    Accordingly, there is no coverage for Anchor, Lozano Insurance, Frank and Lissette Lozano, and Kevin Pawlowski if a final adjudication establishes they gained profit or advantage they were not entitled to.

## COUNT XII – NO COVERAGE FOR ANCHOR P&C UNDER THE DEFINITION OF LOSS

121.    Underwriters incorporate paragraphs 1 – 61.

122.    The definition of damages in the Insurance Company Liability Coverage Section does not include "any amounts for which the Insured is alleged to be liable under any insurance or reinsurance policy, contract, treaty, binder, slip, certificate, cover note, agreement, suretyship, endorsement, endowment, or annuity." (*See* Policy, Pg. 55.)

123.    In his complaint, Alfonso alleges Anchor P&C breached the terms of the policy issued to the Shipps because it failed to provide them with coverage and a defense for claims made by him.

124.    He also alleges Anchor P&C is liable for the Shipps defense costs, as well as the amount of the consent judgment against them, which were covered by the policy.

125.    The damages Alfonso seeks from Anchor P&C are not contemplated by the policy's definition of Loss. Accordingly, there is no coverage for Anchor P&C for the claims by Alfonso.

## **REQUESTED RELIEF**

Underwriters request that this Court:

a.  Take jurisdiction and adjudicate the rights of the parties under the policy.

b. Find and declare that the Underwriters policy issued to Anchor Insurance Holdings, Inc. is void *ab initio*.

c. Alternatively, declare that Underwriters do not have a duty to defend or indemnify the insureds and purported insureds for any of the four underlying lawsuits.

d. Reimburse Underwriters for all of the attorney's fees and costs it has incurred to defend the insured.

e. Award to Underwriters all costs incurred to prosecute this action, as well as any other relief that this Court deems equitable, just, and proper.

Respectfully submitted,

/s/SINA BAHADORAN

SINA BAHADORAN
Florida Bar No. 523364
Sina.Bahadoran@clydeco.us
SERGIO BUENO
Florida Bar No. 112401
Sergio.Bueno@clydeco.us

Clyde & Co US LLP
1221 Brickell Avenue
Suite 1600
Miami, Florida 33131
T: 305.446.2646

## CERTIFICATE OF SERVICE

WE CERTIFY that on February 16, 2021, this document was e-filed using the CM/ECF system. We further certify that we are unaware of any non-CM/ECF participants.

/s/SERGIO BUENO
**SERGIO BUENO**